**Matter of Davidson v Town of Charlton Planning Bd.**

2024 NY Slip Op 31501(U)

April 29, 2024

Supreme Court, Saratoga County

Docket Number: Index No. EF20221614

Judge: Richard A. Kupferman

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

STATE OF NEW YORK
SUPREME COURT          COUNTY OF SARATOGA

---

In the Matter of the Application of
NICHOLAS DAVIDSON and
CARRIE ANN DAVIDSON,

**DECISION, ORDER &
JUDGMENT**

Index No.: EF20221614

Petitioners/Plaintiffs,

-against-

TOWN OF CHARLTON PLANNING BOARD,
THE TOWN OF CHARLTON, and TOWN OF CHARLTON
TOWN CLERK,

Respondents/Defendants,

For an Order and Judgment Pursuant to Article 78 of the Civil
Practice Law & Rules, a Declaratory Judgment pursuant to
CPLR 3001, and an Order of Permanent Injunction.

---

Appearances:

Jonathon B. Tingley, Esq.
Gilchrist Tingley, P.C.
251 River Street, Suite 201
Troy, New York 12180
*Attorneys for Petitioners/Plaintiffs*

William J. Keniry, Esq.
Tabner, Ryan & Keniry, LLP
18 Corporate Woods Blvd, Suite 8
Albany, New York 12211
*Attorneys for Respondents/Defendants*

KUPFERMAN, J.,

The petitioners are siblings. They are seeking to subdivide a parcel of real property into

two lots in the Town of Charlton ("Town"). The subject property (owned by the brother) has been

the subject of many subdivisions over the years, leaving it in its current form with limited road

frontage, despite its overall size of 66 acres.

1

The current subdivision application seeks to create a new lot (2.01 acres) for the sister to build a single-family residence. The Town's Planning Board ("Planning Board") initially referred the matter to the Town's Zoning Board of Appeals ("ZBA") for an area variance for road frontage because the tax roll map showed the overall road frontage for the property as only 395.45 feet.[1] At that time, the frontage variance allegedly needed was approximately five feet (based on the tax roll map).

During the proceedings before the ZBA, the petitioners' father (a prior owner of the property) appeared on behalf of his children. He discussed the initial proposal, which was set forth on a survey map from 2010 ("2010 map"). He clarified that the 2010 map depicts an abandoned house (also referred to as a farmhouse) that his son was rehabilitating. After the renovations were completed, his son intended to rent out the farmhouse as a two-unit house.

During the public hearing before the ZBA in May 2021, members of the Planning Board voiced concerns regarding the proposed shared driveway for the two lots and the placement of the proposed house in front of the farmhouse. In response to these comments, the father stated that he could construct another driveway to eliminate the shared driveway, and offered to angle the proposed house so that the farmhouse was not directly behind the proposed house. When asked if there was any major obstacle to moving the proposed subdivision to the left, the father stated that it would be more expensive but that it could be done.

During his discussions with the ZBA, the father agreed to modify the proposed plan to relocate the new proposed lot to the southern side of the road frontage ("proposed southern lot"). This still required a variance, because although the proposed southern lot (2.01 acres) would have

---

[1] In contrast, the petitioners' map/survey from 2010 identifies the subject parcel as having a total road frontage of approximately 401 feet (with each proposed lot having a minimum of 200 feet).

2

226 feet of road frontage, the remaining lands of the larger parcel would be left with only 175 feet of road frontage, which was less than the minimum frontage required for a lot. The petitioners therefore sought a 25-foot frontage variance from the ZBA.

In connection with the modified proposal, the petitioners submitted a new survey map ("2021 map"), which unlike the petitioners' prior map depicts wetlands covering a significant portion of the proposed southern lot. This generated significant concern given the limited setback distance available between these structures (the septic system, the well, and the house) and the wetlands. Ultimately, in December 2021, the ZBA granted the 25-foot variance for road frontage to allow for the applicant to proceed with the subdivision.

Thereafter, in January 2022, the Planning Board members raised concerns regarding the potential impact of the development on the wetlands, the limited area available to build in the proposed new lot, and the problems with replacing the proposed septic system or expanding the proposed house in the future. In response to these concerns, the petitioners submitted a revised map, which proposed to reduce the size of the building envelope and place the septic system to the farthest point away from the wetlands.

When asked at a meeting in February 2022 if any other ways existed to mitigate against the wetlands' disturbance, the petitioners' surveyor responded, "not really." He indicated that they were "very limited in their space" and that this was "the best they could do."[2] One of the Planning Board members stated that "it appears the downward grade from the septic system to the well is 0 feet one way and 100 feet the other way." Petitioners' surveyor stated that "the USDS topo lines

---

[2] The proposal was based partially on the brother's desire to retain the pond on his property and to expand it in the future. In addition, alternative proposals were allegedly limited based on the condition of the land and the expenditures needed to improve it.

3

do not represent the contours that are actually there, it is flat." Another Planning Board member expressed concern for future owners and their desire to increase the house size and the septic size.

At its February 2022 meeting, the Planning Board voted in favor of serving as the lead agency; issued a negative declaration under the State Environmental Quality Review Act ("SEQRA"); and scheduled a public hearing for March 21, 2022. The Planning Board, however, expressed concerns about the wetlands when it considered the potential environmental impacts from the subdivision. When completing the short Environmental Assessment Form, the Planning Board included a notation, which reads: "This proposed project violates the policy of the planning board, Charlton Environmental Conservation Commission and Town Board to treat all [wetlands] regardless of [whose] jurisdiction with a 100 feet buffer. This Board needs to see the [applicants'] plan to mitigate wetland impacts before it can make a final determination on this project."

Prior to the public hearing, the Town's designated engineer ("EDP") raised an issue relating to sight distance at the proposed driveway and recommended that the Planning Board require the applicant to provide a sight distance evaluation (intersection sight distance) prepared by a licensed professional with traffic engineering experience in accordance with the criteria of the American Association of State Highway and Transportation Officials ("AASHTO"). EDP also opined that the wetlands shown on the map it reviewed did not appear to be inclusive of the actual site conditions and that a gap appeared to exist between the two sections shown. In addition, EDP also opined that the proposed lot did not appear to contain sufficient area to construct a house, septic (primary and replacement), and a well. Specifically, in a letter dated March 10, 2022, EDP stated, as follows:

> "Based on the wetlands information provided thus far, there is a limited area available for a septic system that meets all required town and state separation requirements. The map actually shows approximately 50% of the system not meeting the required buffers.

4

The map shows a primary location for a proposed system based on a conventional system layout. The deep test pit and percolation test information provided … suggest that due to seasonal water, a shallow fill system will be required. Due to the addition of fill to construct a shallow fill system, a larger area is typically required for these type systems, and the separation distances are measured from the toe of the fill limits. Based on the limited area of building envelope shown (based on undocumented wetlands) it would appear that the proposed lot does not contain sufficient area to construct a house, septic (primary and replacement) and a well, that would be compliant with all separation requirements."

Prior to the public hearing, in a letter dated March 17, 2022, the Saratoga County Planning Board ("SCPB") opined that these concerns raised by EDP needed to be addressed to create a safe environment for the proposed single-family use. Although it found that no significant county-wide impacts existed, the SCPB nevertheless provided advisory comments with numerous concerns, including the following: "the odd shape of the proposed lot"; the creation of a lot "with skewed boundary lines"; "the existence of an overhead electrical transmission wire crossing the area of the proposed lot"; potential "safety issues [from the overhead wire] during and post construction of the proposed home"; and "the possible impacts to the existing wetlands and drainage corridor surrounding the proposed building envelope of the proposed home." The SCPB noted that "the proposed subdivision appears to be placed in an area of marginal lands that was probably construed because of the need for road frontage" and that the applicant should "investigate possible alternative areas that may be more suitable to building a single-family home on the 66-acre parcel."

On the day of the public hearing on the subdivision application, the petitioners' counsel provided a letter and documents responding to the comments submitted by EDP and the SCPB. Regarding the sight distance issue, the petitioners' counsel noted that a highway permit was previously issued in April 2010 for a proposed driveway (never constructed) in connection with a prior (unapproved) subdivision application, and that the current proposal requires the issuance of

5

a highway permit from the Town Highway Superintendent prior to the issuance of a building permit. He further disputed that any basis existed to require an AASHTO analysis.

In response to the wetlands issue, petitioners' counsel provided a letter response on the surveyor's stationary, indicating that the surveyor's staff delineated the wetlands on September 1, 2021 (after the date on the 2021 map) and that the wetland boundary and stream location were accurately documented on the subdivision map (dated August 27, 2021). In addition, in response to the septic issue, the petitioners' counsel submitted a letter from a professional engineer ("PE") who stated that the proposed septic system would be 37 feet by 67 feet (slightly smaller than the area designated in the proposed plan); and that the system would be located at least 100 feet from the well, at least 10 feet from the property line, and at least 20 feet from the dwelling. In his letter, the PE asserted that the Department of Health Design Handbook did not require a 50% expansion reserve or a 100% full replacement area. He opined in his letter that these were only suggestions (not requirements) and that the location of the proposed onsite disposal system was "a viable code compliant option."

The petitioners' counsel explained the proposal and these materials during the public hearing. Thereafter, a neighbor then made several comments. She stated that a rather large culvert exists in the area; that the water drains towards the proposed structures; and that the area is wet. The neighbor believed that proposed septic would be in an area that had historically been used as a small fishing pond. No other members of the public made any comments. The public hearing, however, was left open at the request of the petitioners' father.

During the continuation of the public hearing, on April 18, 2022, the petitioners' counsel provided a letter and additional materials to the Planning Board to review and consider, including a table from the Department of Health regulations, an excerpt from the Federal Highway

6

[* 6]

Administrator's Manual, and several aerial images (from Google) depicting a portion of the property on several different dates. No members of the public offered any further comments. Nonetheless, the chairperson stated that they would ask the Town's designated engineer to review the new information from the petitioners' counsel and that the public hearing would be left open until the next meeting (May 16, 2022).[3]

On or about May 4, 2022, EDP responded to the new information provided by petitioners' counsel. Regarding the sight distance issue, EDP continued to stand by its recommendation to require the petitioners to conduct an AASHTO analysis. EDP noted that it was "not provided a copy of the previously submitted subdivision proposal and cannot verify if any action was taken on that submittal (regarding the proposed driveway lot #1), or if in fact a 'highway permit' was issued." EDP also noted that the Planning Board was not responsible for existing situations that may, or may not comply with AASHTO, and that it is "tasked with assuring that any new proposed lot created in the town will have safe ingress and egress onto existing roadways." Regarding the remaining issues, EDP further concurred with SCPB's comments and stated that it "would appear that there may be a better location on this large parcel to construct a new home, where the house may not be located on 'marginal lands.'"

On or about May 11, 2022, the petitioners' counsel provided the Planning Board with additional materials, including a letter from the petitioners' surveyor providing additional measurements and opinions related to the subdivision proposal. The surveyor concluded (without identifying the precise location of his measurements) that the sight distance from the proposed

---

[3] When petitioners' counsel asked if he could request that the public hearing be closed, the chairperson explained that it would not be prudent to close it because the engineering escrow account had not yet been funded and closing it would start the time for the Planning Board to render a decision on the application. The chairperson explained that in the past some applicants have refused to pay the engineering fees after receiving a decision.

7

driveway was 482 feet in one direction (looking north) and 461 feet in the other direction (looking south). Based on these measurements (and various assumptions set forth in the federal manual), the petitioners' counsel alleged that no safety issues existed based on the sight distance. Regarding the elevation issue, the surveyor noted that the "existing topography within the building envelope area (including the septic and well areas) is generally flat with intermittent high and low variations in topography that naturally occur in any landscape." He opined that in "the area of both the septic system and the well location, the elevation is approximately 490 feet." He opined that the "final location of the septic system and the well will be required to comply with health department regulations" and that "the proposed grading for the house that is located between the proposed septic system and well location will ensure that the septic system does not have a direct flow line to the proposed well."

On May 16, 2022, the Planning Board continued the public hearing. After no one from the public appeared to speak, the Planning Board voted to close the public hearing. Thereafter, on June 15, 2022, the Charlton Environmental Conservation Commission ("ECC") provided its comments to the Planning Board. The ECC agreed with the SCPB's comments that the proposed subdivision appears to be placed in an area of "marginal lands" and that a more acceptable area might be found to subdivide 2 acres from the 66-acre property. The ECC stated that the "odd shaped lot results in the house, well, septic and driveway being tightly packed between a wetland area, the pond, a seasonal runoff area and the existing driveway …." The ECC noted that almost no room existed "to relocate a well or septic system, if ever needed, and continue to meet the NY State health separation requirements, or for common add-ons to the house such as a deck, pool, or garage." The ECC also raised concerns about the wetlands, asserting that the Planning Board

8

should protect all wetland areas with a 100-foot buffer regardless of whether any federal or state laws require such a buffer.

At the next meeting on June 20, 2022, the Planning Board members explained that they had numerous concerns regarding the proposed subdivision. They commented on the problems created by the configuration of the proposed smaller lot; the limitations on building based on the wetlands, the pond, the stream, seasonal runoff, and the overhead power line; the lack of suitable land to relocate/replace the well or septic or accommodate common additions such as a deck or pool; the building limitations on the size of the house and the septic; the wetness of the property; the sight distance concern; the existence of a large culvert, which was reportedly four feet in diameter; the risk of potential flooding and erosion; the potential for well water contamination; the danger posed by the overhead power line; and the limited setback distance of the proposed septic and house from the wetlands. Members further opined that a more acceptable area to subdivide could be found from the 66-acre parcel.

At the June 20, 2022 meeting, the Planning Board ultimately voted to deny the application, providing numerous reasons in its written decision, which was filed the following day. Thereafter, the petitioners commenced this hybrid action-proceeding seeking to annul the Planning Board's determination, among other things.

### Threshold Procedural Issue

Prior to addressing the substantive claims asserted in this case, the Court must first address a threshold procedural challenge concerning the contents of the administrative record. Specifically, the petitioners contend that the administrative record filed by the Planning Board contains several pages that are irrelevant to the CPLR Article 78 claim; that several documents were erroneously excluded from the administrative record; and that the certification for the record

9

was insufficient. Based on these alleged deficiencies, the petitioners contend that they should be provided a default judgment against the Planning Board pursuant to CPLR 7804.

The Court agrees that some of the record pages (pages 10-18) are not relevant to the Planning Board's denial of the subject application and therefore should not have been included as part of the administrative record. These documents include invoices, receipts, and correspondence from 2010 and 2011. They were apparently included as responsive to the other claims/issues in the case. Notwithstanding, their inclusion does not warrant the issuance of a default judgment against the Planning Board. Rather, the appropriate remedy would be to disregard the documents when considering the Article 78 claim and/or strike them from the administrative record.[4]

Further, to the extent that any materials were erroneously omitted from the record or that the original certification was missing any critical language, any alleged non-compliance was inadvertent and non-prejudicial. As such, any such defect should be disregarded as a mere irregularity (see CPLR 2001; 2101[f]; 7804[e]; Matter of Robert E. Havell Revocable Trust v Zoning Bd. of Appeals of Vil. of Monroe, 127 AD3d 1095, 1096 [2d Dept 2015]; Matter of Cliff v Kingsley, 293 AD2d 954, 955 [3d Dept 2002]).

Indeed, nearly all the documents allegedly missing from the record have since been provided to the Court by the petitioners' counsel, and the Planning Board has since resubmitted an updated certification (by way of affidavit) in response to the petitioners' objection to the language used. The Court now appears to have all the materials considered by the Planning Board during the administrative proceeding, with the sole exception being certain photographs that were apparently taken of the property during a site visit by one of the Planning Board members. The

---

[4] As these documents are relevant to other issues in this case (i.e., bias and consulting fees), the Court will consider them solely for these other issues.

10

clerk/custodian for the Planning Board has explained in an affidavit that the photographs were not part of the official file and that she believes that the photographs were taken by a member of the Planning Board on her own personal electronic device.

While the Court would have preferred for the administrative record to include these photographs (as the meeting minutes reflect that the photographs were reviewed and discussed), they are not necessary for the Court to intelligently review the Planning Board's decision. The meeting minutes, for example, reflect that the parties did not rely on them in any significant manner. Rather, the petitioners relied on aerial photographs from Google Earth (provided to the Court) and descriptions of the property based on personal observations. The Planning Board similarly did not place any significant weight on them; rather, it relied primarily on the maps, visual inspections, and the personal observations discussed during the proceedings. Given the circumstances, the Court finds that it has all the materials necessary to render a decision in this matter and that it may proceed with its review (see Argyle Conservation League v Town of Argyle, 223 AD2d 796, 798 [3d Dept 1996]; see also Iwan v Zoning Bd. of Appeals, 252 AD2d 913, 914 [3d Dept 1998]; Scott v City of Buffalo, 20 Misc 3d 1135[A], 2008 NY Slip Op 51738[U] [Sup Ct, Erie County 2008]).

Further, the petitioners' reliance on Arnot-Ogden Mem. Hosp. v Axelrod, for the proposition that a default judgment should be awarded in their favor, is misplaced (see 95 AD2d 947, 947 [3d Dept 1983]). In that case, the respondent repeatedly and willfully failed to meet court and statutory deadlines (see Arnot-Ogden Mem. Hosp., 95 AD2d at 947-949). In contrast, the alleged non-compliance in this case was not willful. No prior order resolved the dispute or directed compliance. Nor was there any pattern of non-compliance.

[* 11]

## CPLR Article 78

Regarding the CPLR Article 78 claim, the petitioners contend that the Planning Board's denial of the subdivision application was arbitrary and capricious, lacking in rational basis, and unsupported by evidence in the record. In reviewing a planning board's decision, judicial review is limited in scope (see Sheer Pleasure Lingerie, Inc. v Town of Colonie Planning Bd., 251 AD2d 859, 861-862 [3d Dept 1998]; M & M Partnership v Sweenor, 210 AD2d 575, 576-577 [3d Dept 1994]). A planning board is responsible for weighing the evidence and exercising its discretion in approving or denying approval to a subdivision plat (see M & M Partnership, 210 AD2d at 576-577; Currier v Planning Bd. of Town of Huntington, 74 AD2d 872, 872 [2d Dept 1980]). Where the planning board's determination "has a rational basis supported by substantial evidence, a court should not substitute its judgment for that of [a planning board] when the [board] has not abused its discretion or acted arbitrarily" (M & M Partnership, 210 AD2d at 576-577; see Heller v Kabcenell, 126 AD2d 728, 728 [2d Dept 1987]). In such cases, the planning board's decision "must be upheld even though a contrary determination could be supported by the record" (Matter of MLB, LLC v. Schmidt, 50 AD3d 1433, 1436 [3d Dept 2008]).

Here, the Planning Board's decision has a rational basis supported by substantial evidence. Prior to voting on the application, several members of the Planning Board articulated their concerns that approval would not be part of a plan for safe, orderly, and efficient use of the land. As explained by its members, a significant portion of the proposed 2.01-acre lot included a narrow strip of land that had limited access, which would require the landowner to cross the stream or obtain another property owner's permission to access the strip. This created problems for maintenance, the potential for confusion and future land disputes, and significantly reduced the size of the buildable area of the remainder of the 2.01-acre lot.

12

In addition, the buildable area on the proposed 2.01-acre parcel was further constrained based on the physical condition of the land, including the location of the wetlands, the pond, the stream, seasonal runoff, and the overhead power line. In fact, the proposed house, well, and septic were all surrounded by water, creating health and safety concerns for the property, the occupants, and the public.

Several Planning Board members further opined that the proposal did not contain sufficient land for the septic system, especially for its relocation if it needed to be replaced. Members also commented on the physical limits preventing the owners and future owners from being able to accommodate typical expansions to the proposed house such as a deck or pool, or otherwise being able to expand the size of the septic system and/or the house in the future. A member also commented that the property was very wet and that she got wet feet when she visited the property in 2010. The chairperson, who visited the property in June 2022, explained that the stream flowed into a culvert located eight or more feet below the road and that the culvert was reportedly four feet in diameter. He also agreed that sight distance for the proposed driveway was a problem and that a safety study should be performed by a licensed professional with traffic engineering experience.

Members also expressed concern regarding several other issues, including the following: potential flooding; erosion; the potential for well water contamination based on the landscape, which was described as sloping downward; the overhead power line that crosses a large portion of the property near the proposed building area; and the limited distance between the proposed septic and house from the wetlands. Members further opined that a more acceptable area to subdivide could be found from the 66-acre parcel.

In the resolution denying the application, the Planning Board further articulated these rational reasons for the denial, concluding that the proposed subdivision violated the Town's Comprehensive Plan and Subdivision Regulations; that the Planning Board observed adverse and unfavorable conditions when it visited the site; and that it had concerns regarding the sight distance from the proposed driveway. Among other things, the resolution concludes that the proposal fails to protect the wetlands; that the character of the land was poor and would not be used safely for building; that the subdivision posed a danger to health and flooding; that it was foreseeable that significant difficulties would arise from the topography and natural conditions; that the applicant failed to show that sufficient area existed for both a full replacement of the septic system and the septic expansion; that the applicant did not reliably show compliance with the requirements of the New York Wastewater Treatment Standards (which require septic tanks to have a 50 foot setback and an absorption field to have a 100 foot setback to a watercourse or wetland); that the subdivision is a very poor design; that the long narrow strip of land was a forced effort to shove the irregular lot into the area to comply with the minimum standards for lot sizes; that there is plenty of land on the larger parcel to safely undertake a safe and compliant subdivision; and that the subject land was subject to flooding and deemed as uninhabitable for residential occupancy.

In connection with the Planning Board's visual inspection, the resolution further provides, as follows:

> "The board's visual inspection of the property demonstrated that the property exhibited the following conditions and characteristics: a constrained proposed lot; a contrived lot configuration; marginal lands; essentially two (2) acres of wetlands constituting the proposed building lot; a large pond next to the proposed living, dwelling and septic areas, including a large pond adjacent to a proposed division line. At the public hearing a neighbor spoke about a large culvert and stated that everything drains to the area where the residence is proposed, and particularly the septic. The septic is proposed in an area that has been a fishing pond. Ignoring the fact

14

that the home and septic are proposed in the middle of the wet area of the property is turning a blind eye to what was observed on site. The improvement would be unsafe for the applicant or a future resident."[5]

Further, contrary to the petitioners' contention, the Planning Board's decision does not rest on generalized community opposition. Rather, the decision is rationally supported by the Planning Board's discretion and commonsense judgment; the firsthand observations of its members discussed during the meetings; the historical facts surrounding the prior subdivisions; the statements made by the petitioners' father during the meetings; the firsthand observations discussed by a neighbor during the public hearing; the materials supplied by the petitioners; and the comments made by the Town's designated engineer, the SCPB, and the ECC, among other things (see e.g. Michelson v Warshavsky, 236 AD2d 406, 407-408 [2d Dept 1997]; Tunis-Huntington Dodge, Inc. v Horn, 29 AD2d 990, 991 [2d Dept 1968]).

In addition, the decision is also rationally based on the petitioners' failure to adequately address several legitimate concerns related to the property's condition (see M & M Partnership, 210 AD2d at 576-577 [drainage concerns]; Michelson, 236 AD2d at 407-408 [flooding concerns]). The petitioners, for example, failed to adequately address the sight distance concerns related to the proposed driveway; the potential problems/risks based on the limited buildable area; the potential problems based on the substantial amount of water on the property; the limited area available to replace or expand the proposed septic system; and the potential impacts that the proposed development would have on the wetlands.

---

[5] Substantial evidence does not appear to support the Planning Board's conclusion that the septic was "proposed in an area that has been a fishing pond." Nonetheless, the record reflects that the area was surrounded by water, that a large nearby pond existed, that the owner of the land desired to expand the pond area, that a second pond formed seasonally, that a four-foot-wide culvert ran through the area, and that the area was wet.

15

This case is similar to M & M Partnership and Michelson. There, the petitioners' responses were inadequate to address legitimate issues raised regarding drainage and flooding. Based on the petitioners' failure to address these legitimate concerns, the appellate courts held that the denial of the applications had a rational basis supported by substantial evidence (see M & M Partnership, 210 AD2d at 576-577; Michelson, 236 AD2d at 407-408). As in these cases, the petitioners here also failed to provide adequate responses to legitimate concerns. This failure left these health and safety concerns unaddressed and provided a rational basis for the denial of the subdivision application.

The Planning Board also rationally considered the lack of available area (and the lack of a concrete plan) for future expansion, repair, and replacement of the septic system. Even if such planning was only a suggestion by the New York Department of Health ("DOH") (as asserted by the petitioners' expert), the DOH's Design Handbook (Section 4.3 at page 24) nonetheless recommends that a landowner plan for future expansion or repair of the absorption area and for future failure, especially as the system has a limited lifespan.[6] In addition, while technology and other mitigation measures "may be available to provide viable alternatives to reserving land for future possibility of system expansion or repair" (Design Handbook, Section 4.3), the petitioners failed to provide any plans discussing any such alternatives.

Further, contrary to the petitioners' contention, the Planning Board properly applied the standards set forth in the Town Law, the Town's regulations, the Towns' Comprehensive Plan, and

---

[6] The Design Handbook provides in part, as follows: "For design and planning purposes, an additional useable area of 50% of the absorption area should be reserved for future expansion or repair of the absorption area. Whenever possible, it is recommended that an area equal to 100% of the required absorption area be reserved to facilitate full absorption system replacement" (Section 4.3, at page 24).

16

the Town's Subdivision Application and Review Guide. The Town Law, for example, emphasizes that the purpose of the subdivision review is to afford "adequate facilities for the housing, transportation, distribution, comfort, convenience, safety, health and welfare" of the local population; and that the planning board must "require that the land ... be of such character that it can be used safely for building purposes without danger to health or peril from fire, flood, drainage or other menace to neighboring properties or the public health, safety and welfare" (Town Law §§ 276[1]; 277[1]).

In addition, the Town's regulations require the Planning Board to protect the Town's natural resources; preserve the Town's rural character; and consider the "safe, orderly, and efficient use of land and/or development" (Town's Subdivision Regulations, Section I). The regulations further specify that the enumerated standards are "minimum requirements" (Section X); that land to be subdivided "shall be of such character that it can be used safely for building purposes without danger to health or peril from fire, flood, or other menace" (Section X [B][1]); and that the Planning Board should consider the "foreseeable difficulties" in constructing a building based on the "topography or other natural conditions" of the land (Section X [F]). The regulations further prohibit the Planning Board from allowing lands subject to flooding or deemed to be uninhabitable from being developed (Section X[G][4]).

The Town's Comprehensive Plan further identifies the preservation of groundwater, streams, and wetlands as a major goal for the Town (Comprehensive Plan, Goal 2, at pages 8, 10). It provides that the Town should place "more emphasis on siting new buildings to include ... setbacks from streams and wetlands" (Comprehensive Plan, Goal 2, at page 10). The Plan further recommends considering the development of guidelines for applicants in connection with the

17

review process to encourage the use of "setbacks from streams, lakes, and wetlands to protect water quality" (Comprehensive Plan, Goal 6, Recommendation 18[d], at page 16).

In addition, the Town's Subdivision Application and Review Guide provides, as follows:

> "If a subdivision plan conforms to the Zoning Ordinance, it does not mean that the proposed plan will necessarily be approved. The Planning Board considers many issues, including but not limited to public safety, traffic, wetlands, water supply, possible effects on neighboring properties, sanitary waste disposal, storm water management, etc. The Planning Board will, however, attempt to work with an applicant to create a subdivision consistent with the purpose of the Zoning Ordinance and Subdivision Regulations" (Town of Charlton Subdivision Application and Review Guide, Purpose of Subdivision Review, at p. 2).

These authorities provided ample support for the Planning Board's consideration of the proximity between the proposed development and the water/wetlands, notwithstanding the lack of any specific distance required by any law/regulation.[7] As explained above, the Town's Comprehensive Plan required the Planning Board to consider and encourage the inclusion of a setback. In addition, the Town Law and the Town's regulations required the Planning Board to consider such proximity based on the potential health and safety risks implicated by developing land nearby water/wetlands. Indeed, as a practical matter, building a house, well, and septic system surrounded by water, without a sufficient setback, can create significant health and safety issues from poor planning.

The Court also disagrees that the Planning Board's setback policy is arbitrary. When possible, the Planning Board requires a minimum 100-foot setback from any water body, whether

---

[7] The record indicates that there is no specific setback distance required by any law/regulation. The respondents do not dispute that the Town and the U.S. Army Corps of Engineers do not mandate a specific setback distance for wetlands. Moreover, while the New York Department of Environmental Conservation (DEC) imposes a 100-foot buffer for wetlands, the DEC opined in a letter (dated March 15, 2022) that the subject wetlands were not within its jurisdiction. As such, the DEC buffer does not apply to the water/wetlands at issue.

18

[* 18]

a wetland, stream, or pond. This is not an arbitrary distance, but rather the same distance imposed by the State for the wetlands it regulates. Such a policy addresses the health and safety concerns created by wetlands, while imposing little, if any, burden on the landowner. In contrast, where insufficient land exists, the Planning Board's policy is flexible. In such cases, the Planning Board does not impose a 100-foot setback requirement but rather exercises its discretion to determine whether such a setback is necessary for health and safety reasons, as it did in this case.

It was also not irrational for the Planning Board to require the petitioners to address its legitimate concerns despite the petitioners' insistence that other departments/agencies would address these concerns in the future. The lack of a concrete plan to adequately address these various concerns could result in several additional problems in the future. Assuming for instance that any of the various departments/agencies denied the required permits/approvals, this would have resulted in a subdivision failure. If the petitioners' approach had been followed by the Planning Board, such poor planning could have ultimately resulted in the creation of two inferior parcels, leaving the larger parcel with less road frontage and the smaller parcel with significant development problems.

In addition, the petitioners also allege that the Planning Board's conclusions conflict with the ZBA's conclusion that the variance would "result in a buildable lot." Aside from the vagueness of this statement, the ZBA did not resolve the issues related to the wetlands and the health and safety of the proposed structures. To the contrary, the ZBA made it clear that the Planning Board was responsible for determining these issues and deciding whether to approve/deny the subdivision application. In addition, no conflict exists given that the record before the Planning Board was more developed than the record before the ZBA.

19

Similarly, the Court is not persuaded that the Planning Board's decision is irrational given its negative declaration from February 21, 2022. The petitioners' contention to the contrary ignores the notation on the SEQRA form, stating: "This Board needs to see the [applicants'] plan to mitigate wetland impacts before it can make a final determination on [the] project." The petitioners further ignore the different standards/factors applicable to a determination of significance as opposed to a subdivision review. They also incorrectly assume that the Planning Board was bound by its prior SEQRA determination throughout the course of its subdivision review, which is contrary to the DEC regulations (see 6 NYCRR § 617.7 [e], [f]).

Further, the record does not support the petitioners' accusations of bias. For example, in accusing the Planning Board of selectively enforcing the regulations against their family and the property, the petitioners cite generally to the denial of a prior subdivision application for the same property in 2011. Yet, the record materials reflect that the Planning Board granted several prior subdivisions for the property/family and that the prior denial concerned alleged contamination, among other things.

The Court also disagrees that the Planning Board engaged in a scheme to increase the petitioners' costs by referring the matter to the ZBA, providing negative comments/objections during the ZBA proceedings, and requiring the petitioners to provide information. While the Court itself would not have referred the matter to the ZBA (given the measurements from the survey), the referral was nonetheless rational based on the alleged discrepancy between the tax roll map and the survey. The Planning Board's comments/objections were also authorized under Town Law § 277(6). In addition, the materials and information required by the Planning Board were standard requests and related to the safe, orderly, and efficient use of the property.

20

Moreover, while the Planning Board initially recommended that the petitioners revise their plans, and then later objected to the revised plan, the Planning Board's recommendation was based on the limited information it possessed at the time. As the record materials reflect, the Planning Board made the recommendation before the wetlands had been delineated and before they were provided with sufficient information to fully evaluate the facts.

For all these reasons, the Court denies the relief requested in the CPLR Article 78 petition and dismisses the proceeding. Notwithstanding, the petitioners may reapply for subdivision approval. If desired, they may attempt to correct the deficiencies in their application or seek approval for the northern proposed lot. The Court would caution against another referral to the ZBA for a road frontage variance on either of these two proposals, as the ZBA has already made findings that would render another referral irrational.[8]  Similarly, the Court would also caution against denying the northern proposed lot based solely on the proposed construction of a house in front of the farmhouse. While the issue was not fully developed during the prior proceeding, the regulation relied upon by the Planning Board concerns lot depth and does not strictly prohibit building a house in front of another house, as the Planning Board's chairperson opined.[9]  Such an interpretation could also be considered irrational given that it would unnecessarily prohibit the development of a single-family residence based on the unfounded fear that the development could result in the urbanization of the area, despite the proposed lot's 2.01-acre size and the existence of the farmhouse and barn behind the proposed house.

---

[8] As explained above, the ZBA has already granted a variance for the southern proposed lot. In addition, the ZBA's variance indicates that the total road frontage is approximately 401 feet, which necessarily rejected the accuracy of the measurements on the tax roll map.

[9] The Planning Board relied on Section X (F)(1) of the Subdivision Regulations, which provides in relevant part, as follows: "Lots should not be of such depth as to encourage the later creation of a second building lot at the front or rear."

21

## Declaratory and Injunctive Relief

In addition to the CPLR Article 78 claim, the petitioners seek declaratory and injunctive relief. On these claims, they contend that the Planning Board failed to timely render a decision on the subdivision application; that the Planning Board is not authorized to impose a setback requirement; and that the Planning Board may not charge applicants for consulting fees.

## Town Law § 276

The Court disagrees with the petitioners' contention that they are entitled to subdivision approval based on the Planning Board's alleged failure to issue a decision within 62 days of the public hearing. As their support, the petitioners rely upon a provision in Town Law § 276 requiring a decision on a final plat "within sixty-two days after the date of the public hearing" (see Town Law § 276[6][d][i][3][a]), as well as another provision mandating that a "final plat shall be deemed granted approval" where "a planning board fails to take action ... within the time prescribed therefor" (see Town Law § 276[8]).

Critically, the petitioners miscalculate the date upon which to run the sixty-two days. While the statute references "the date of the public hearing," the preceding language in the statute (when read as a whole) clarifies that the time period runs after the public hearing is closed and that such closure requires a motion. Specifically, the preceding language provides, as follows: "[t]he hearing on the final plat shall be closed upon motion of the planning board within one hundred twenty days after it has been opened" (see Town Law § 276[6][d][i][2]). As the motion to close the hearing was not made and approved until May 16, 2022, the time to render a decision did not begin to run until such time. The Planning Board therefore complied with the plain language of the statute when it issued a decision in June 2022, well within this 62-day period.

22

Further, to the extent that the petitioners contend that the Planning Board acted arbitrarily in failing to close the public hearing on April 18, 2022 (less than 120 days after it was opened), this is not a legitimate basis to declare the subdivision application approved on default under Town Law § 276(8), as such a remedy is not authorized in this case by the plain language of the statute. As discussed above, the statutory basis for a default approval would require a finding that the planning board "fail[ed] to take action" "within the time prescribed therefor." Again, as the applicable time period for rendering a decision is statutorily measured from when the public hearing is closed, the Planning Board took action "within the time prescribed therefor." Town Law § 276(8) therefore does not provide any support for a default approval.

**Wetland Policy**

As discussed above, the Planning Board acted rationally when it considered the proximity of the proposed development to the water/wetlands. Given that this issue has already been adjudicated on the Article 78 claim (see above), there is no need for any declaratory judgment on this issue (see James v Alderton Dock Yards, Ltd., 256 NY 298, 305 [1931]; see also CPLR 3001; Equitable Leasing, Inc. v Maguire, 36 AD2d 1020, 1020 [4th Dept 1971] ["The trial court properly exercised its discretion in declining to entertain this declaratory judgment action since the parties have other available relief by existing remedies at law."]).[10]

In addition, given that the Planning Board properly exercised its discretion on this issue, the petitioners have not faced any actionable harm from this policy. It is also too speculative to

---

[10] The discretionary nature of the policy and its fact-specific nature also render it inappropriate for declaratory relief (see CPLR 3001; New York Public Interest Research Group, Inc. v Carey, 42 NY2d 527, 531 [1977] ["a request for a declaratory judgment is premature if the future event is beyond the control of the parties and may never occur"]; Manuli v Hildenbrandt, 144 AD2d 789, 790 [3d Dept 1988]).

23

conclude that the policy will be arbitrarily applied against them in the future.  Accordingly, the request for injunctive relief on the setback issue is denied.

**Consulting Fees**

The petitioners also assert that the Planning Board improperly required them to pay consulting fees to the Town's designated engineer in connection with the subdivision review.  In response, the respondents contend that the fees were proper and authorized.  They have provided a copy of a local law, a fee schedule, a Town Board resolution, and other materials.  The petitioners dispute that the local law applies to them and contend that the fee procedure is unreasonable.

Regarding the request for a declaratory judgment, this remedy is discretionary and "dependent upon facts and circumstances rendering it useful and necessary" (James, 256 NY at 305).  "Where there is no necessity for resorting to the declaratory judgment it should not be employed" (id.; see also CPLR 3001; Equitable Leasing, Inc., 36 AD2d at 1020).

Here, the Court does not consider the use of a declaratory judgment as useful or necessary for the issue presented.  In particular, the petitioners could have demanded and sought a refund of the $850.00 paid (see e.g. Town Law §§ 118 & 119; Matter of Harriman Estates at Aquebogue, LLC v Town of Riverhead, 151 AD3d 854 [2d Dept 2017]; Wildlife Associates v Town Bd. of Southampton, 141 AD2d 651 [2d Dept 1988]).  The availability of this alternative remedy renders a declaratory judgment unnecessary (see James, 256 NY at 305; see also CPLR 3001; Equitable Leasing, Inc., 36 AD2d at 1020).[11]  The declaratory judgment claim is also overly broad and

---

[11] The Court also notes that the cause of action seeking declaratory relief does not request a refund or any monetary damages. Nonetheless, the amount in controversy between the parties is relatively minor ($850.00) and therefore should be resolved in small claims court. The Court would in fact convert the claim into a claim for a refund and transfer the claim to small claims court but for the potential objection from the respondents that the claim must be pursued pursuant to CPLR Article 78 and that such proceedings must be litigated in Supreme Court (see CPLR 7804 [b]).

24

improperly seeks to obtain relief that would extend well beyond a declaration of only the rights and controversy between the parties (see CPLR 3001). Moreover, no evidence exists that the Planning Board will decline to review any future applications of the petitioners (or suspend review) based on their non-payment of any future fees. Any such conduct would subject them to additional litigation (another CPLR Article 78 proceeding) and could result in a default approval based on any such delay.

The Court further declines to award any injunctive relief. To be entitled to a permanent injunction, a plaintiff is "required to establish not only irreparable harm, but also the absence of an adequate legal remedy" (McDermott v City of Albany, 309 AD2d 1004, 1005 [3d Dept 2003]; see McNeary v Niagara Mohawk Power Corp., 286 AD2d 522, 525 [3d Dept 2001]). Even assuming for the sake of argument that the fees were improper, there is no basis to conclude that the petitioners face any irreparable harm or that they lack an adequate remedy at law. The Town (a party to this action) could also render such future disputes moot by simply amending the current law to address the petitioners' concerns.

The Court has further considered whether it should convert these causes of action for declaratory/injunctive relief into a claim pursuant to CPLR Article 78 for a refund of the $850.00 paid for consulting fees (see CPLR 103 [c]). Based on the circumstances, the Court does not consider such a conversion appropriate given the relatively small monetary amount involved, the petitioners' decision not to pursue a refund as a direct claim in this action (as opposed to merely requesting a refund as incidental relief on the injunction claim), and the need for new pleadings, a new administrative record, and further proceedings to frame the issues and adjudicate the merits of any direct claim for a refund.

Accordingly, based on the circumstances, the Court finds that it is appropriate to dismiss the claims seeking declaratory and injunctive relief, without prejudice to any rights the petitioners may have to commence an appropriate proceeding for a refund (see CPLR 103[c]).

The Court has considered the petitioners' remaining contentions and finds them to be moot and/or not persuasive.

It is therefore,

**ORDRED, ADJUDGED, and DECREED,** that on the cause of action seeking a declaratory judgment regarding the Planning Board's alleged failure to close the public hearing on April 18, 2022, the Court finds that petitioners did not obtain, and are not entitled to, a default approval of their application under Town Law § 276(8); and it is further

**ORDRED, ADJUDGED, and DECREED,** that the causes of action seeking injunctive and declaratory relief regarding the charges imposed on the petitioners for the consulting fees are hereby **DISMISSED**, without prejudice; and it is further

**ORDRED, ADJUDGED, and DECREED,** that the petitioners' request for relief pursuant to CPLR Article 78 is **DENIED** without prejudice to the petitioners' right to file and pursue a new application for subdivision approval; and it is further

**ORDRED, ADJUDGED, and DECREED** that the remainder of the petition/complaint is hereby **DISMISSED**.

Dated: April 29, 2024
at Ballston Spa, New York

HON. RICHARD A. KUPFERMAN
Supreme Court Justice

Enter.

26

[* 26]